UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

AMERICAN BEER DISTRIBUTION CO., INC.,

                    Plaintiff,                             07-CV-8397

    -against-

SHELTON BROTHERS INC.,

                    Defendant.

------------------------------------------------------------x

### DECLARATION OF WILLIAM SHELTON

    1.     I am the Controller of Shelton Brothers, sued herein as Shelton Brothers, Inc., and I submit this Declaration in Opposition to Plaintiff, American Beer Distribution Co., Inc's ("ABD") Motion for a Temporary Restraining Order.

    2.     Shelton Brothers is a small importer of foreign specialty beers which are distributed by wholesalers throughout the United States. Since September 2004, ABD has distributed in New York City beer imported by Shelton Brothers from abroad. The beer is delivered to ABD in New Jersey and is shipped by ABD into New York. The beer originally makes its way into New Jersey from Europe via cargo ship that unloads in a port in New Jersey. Once there, a warehouse operation run by a third party contractor picks up the beer and stores it at a warehouse where ABD takes delivery. This sequence of events has been consistent over the course of dealing between ABD and Shelton Brothers.

    3.     As Plaintiff concedes in its moving papers, ABD was terminated as a

distributor by Shelton Brothers' beer on August 27, 2007, over a month before this action was brought. The basis of the termination was ABD's chronic and persistent failure to make payment of money due and owing.

4. Since the commencement of the relationship with ABD, ABD has been in default of its obligation to pay invoices in a timely manner. Each of the invoices we provided to ABD provides that payment is due in thirty (30) days of pick-up and that interest of eighteen percent (18%) will be applied to any amount unpaid after 30 days. See Exhibit A hereto. Attached hereto as Exhibit B is the payment history of ABD. As seen from that exhibit, ABD has consistently been in default of its obligation to make payment in a timely manner.

5. Until late July, 2007 virtually all of ABD payments were delinquent; only two out of 45 payments made by ABD were made on a timely basis. The vast majority of the payments were made months after the invoice date. Several of the payments were more than 200 days late, one payment being 339 days late, another payment 318 days late and yet another payment for 375 days late. In fact, until late July of this year, ABD had not made a *single payment* for any shipment made in 2007. On or about July 20, 2007 Shelton Brothers received a payment of $39,440 on past due invoices and on August 1st received another payment of $29,250.64 on past due payments. Significantly, these payments were made after ABD became aware of Shelton Brothers' discussions with Manhattan Beer Distributors ("Manhattan").

6. As of July 1, 2007, ABD had a past due balance owing Shelton Brothers

over $104,000, not including accrued interest on past due payments. For the year prior to July 1, 2007, ABD's past due balance varied between $65,000 and $104,000, and was consistently in the $80,000 to $100,000 range.

7.  In fact, even ABD's latest payment was delinquent, although ABD backdated its check to make it look like the payment was received on time. On July 31, 2007, Invoice No. 13546 was sent for shipment received by ABD on or about July 30, 2007 in the amount of $21,896.20. On September 6, 2007 ABD mailed a check to cover that invoice and a subsequent invoice of $680.83 but backdated the check to August 31, 2007 to make it appear that the payment was timely. See Exhibit C hereto.

8.  Contrary to the statements made by Mr. Marino in his Declaration, Shelton has never excused ABD's consistent late payment of invoices, and both Daniel Shelton, President of Shelton Brothers, and I have had numerous conversations with Mr. Marino concerning ABD's failure to make timely payment for product delivered.

9.  As more fully set forth in Exhibit B, ABD at this time owes Shelton $27,172.18 in past due interest, which is due and owing and has not been paid.

10. When Dan Shelton approached Mr. Marino about giving up the distributorship in favor of a distribution company that could more effectively distribute our beer and which would make payment on a timely basis, Mr. Marino suddenly began to make past due payments in an attempt to bring his account current. Mr. Marino obviously did this in anticipation of bringing this action to prevent Shelton Brothers from entering into a distribution agreement with Manhattan.

11. There are several facts set forth in Mr. Marino's Declaration which are

incorrect. First, Mr. Marino states that Shelton would not be harmed by maintaining the status quo through entry of an injunction herein. That is absolutely not true. If an injunction were entered herein, Shelton Brothers would be effectively cut out of the entire New York City market because Shelton Brothers is unwilling to ship product to ABD at a level that the market demands simply because ABD has been unwilling and unable to make timely payment or to effectively distribute Shelton Brothers' beer.

12. Our largest retail customer has recently advised us that if it does not receive more consistent and larger shipments of Shelton Brothers' beer, it will discontinue our line of beer.

13. We know that the demand for our product is much greater than the levels that ABD has been able to distribute it because numerous retailers have complained to us about their inability to purchase our beer from ABD. In fact, two customers advised us that Joe Marino of ABD had advised them that he could not meet their demand because he was not receiving sufficient shipments from Shelton Brothers because he was so far in arrears on payments to Shelton Brothers.

14. Mr. Marino also makes the statement that Shelton Brothers' products represent approximately forty percent (40%) of the direct wholesale "business", twenty-one percent (21%) of the wholesale volume and twenty-five percent (25%) of the profit derived from wholesale business of ABD. I personally have no basis to confirm those numbers since I am not fully familiar with ABD's other product lines. However, Shelton Brothers became aware of the fact that ABD has in fact sold off distribution rights of certain of its beers so that these numbers may be artificially inflated by the effort of ABD to "cash out" its business.

4

15. Mr. Marino's efforts to actively sell off brands of beer that he distributes is entirely inconsistent with his claim that irreparable injury will result if he loses retail customers because of the loss of the Shelton Brothers account.

16. Further Mr. Marino states that despite numerous requests by ABD, Shelton refused to provide ABD with a written distribution agreement. Marino Decl. at ¶ 16. This is absolutely untrue. The Court should be aware that the Shelton Brothers routinely does not draft distribution agreements to provide to its wholesalers. Rather, the *wholesalers* provide agreements to Shelton Brothers because the wholesalers are more familiar with the particular laws in the relevant state than Shelton Brothers is. ABD, unlike our other wholesalers in other states, never provided us with a contract nor did it ever make a demand on Shelton Brothers that a written contract be provided.

17. Further, Mr. Marino says that ABD "devoted significant time, effort and money to marketing and developing the market for Shelton Brothers. As a result of these efforts, annual wholesales sales of Shelton Brothers now exceed 7,000 case equivalents on an annual basis and is continuing to grow." Marino Decl. at ¶ 19. There are numerous misstatements of fact in that statement.

18. First, ABD did not spend significant time, effort and money to develop a market for Shelton Brothers. In fact, one of our on-going complaints about ABD's efforts is that ABD simply continued to sell to customers that Shelton Brothers had already developed with other wholesalers, before ABD was retained to distribute Shelton Brothers products.

19. Second, the current annual volume does not exceed 7,000 case equivalents. In fact, the current annual volume is approximately 4,061 case equivalents.

5

Certainly, a much higher volume could be sold if we had a wholesaler who was willing to actually make the effort to market our product and would pay on a timely basis for product that was delivered. ABD continually failed to perform in either of these respects.

20.     An annual case equivalent total of 4,061 for the entire City of New York is a pathetic number. Shelton Brothers offers more than 100 different beers. ABD sold on average about $1,300 from each product during the entire year from August 1, 2006 to July 31, 2007.

21.     It is also untrue that ABD's sales of Shelton Beers have steadily increased. In fact they have stagnated and now have even declined. During the 11-month period from September 9, 2004 (the date of the first shipment) to July 31, 2005, sales from Shelton Brothers to ABD were $111,122.61. From August 1, 2005 to July 31, 2006 the sales from Shelton Brothers to ABD went up $143,096.80. This increase was essentially insignificant because (1) the second period is a 12-month period as opposed to an 11-month period; and (2) nationally, Shelton Brothers sales went up approximately fifty percent (50%). During the period from August 1, 2006 to July 31, 2007 sales actually *went down* to $132,075.91. In the same period, Shelton Brothers sales nationally went up again by another fifty percent (50%). The primary reason for ABD's decline is that ABD simply was not paying bills and we were reluctant to sell more product to ABD given its tremendously delinquent payment history.

22.     Moreover, the sales for the last twelve (12) months are artificially inflated because of a significant shipment that was made in July, 2007 after ABD finally made substantial payments on the arrears owing to Shelton Brothers. Without this shipment (which was clearly designed to enhance ABD's position in its negotiations with

6

Manhattan and its position before this Court), the sales to ABD from Shelton Brothers on an annual basis would be significantly lower.

23. In fact, ABD's selling efforts were so inadequate that Shelton Brothers was forced to actually make commission payments to ABD's *own salesman* so that they would have sufficient funds to make a living wage, since ABD was unable or unwilling to pay any commissions to its own sales people. Because ABD's sales efforts have been so lackluster, ABD's key sales person has recently left and joined Manhattan.

24. Mr. Marino is also incorrect when he asserts that Shelton Brothers took away his exclusive distribution on Long Island. In fact, Mr. Marino asked us if he could attempt to sell our beer on Long Island and we agreed to give him the opportunity to do that. After several months of completely ineffective sales, Mr. Marino acknowledged that he was unable to distribute our products successfully on Long Island and we retained an exclusive distributor for Nassau and Suffolk Counties. We never agreed to give ABD an exclusive on Long Island.

25. The relationship with ABD has become untenable, not only because Shelton Brothers' sales in the City of New York have never been satisfactory and, as noted above, are in fact declining, but because we are at risk of losing, on a permanent basis, a number of retail customers.

26. I believe that if Shelton Brothers is not enjoined from entering into a new distribution agreement with Manhattan, its annual sales of product in the New York market in the first year alone will reach on an annual basis at least $500,000 per annum by the end of the first year. However, if Shelton Brothers is enjoined from entering into that distribution arrangement, then Shelton Brothers will potentially lose the opportunity

to sign an agreement with Manhattan; will inevitably lose retail customers who will switch to other brands; and will be entirely shut out of the New York market.

27. The Christmas season is about to begin which is the busiest time of our year. We sell forty percent (40%) of our total product in the two months of November and December. If we are enjoined from obtaining an effective distributor of our product now, we will never recover those sales.

28. Should this Court decide that a Temporary Restraining Order is appropriate, the Court should impose a bond of at least $50,000 to protect Shelton Brothers from the inevitable lost sales that will result from Shelton Brothers' inability to enter into an agreement with a distributor that is able to market its beer effectively in New York City. Should the Court grant a preliminary injunction pending final determination of the action, the Court should impose a bond in amount of $1 million to cover not only anticipated lost sales during the pendency of this action, but also lost future sales that will be permanently lost because of Shelton Brothers' inability to meet retail demand on a timely basis.

Dated: October 4, 2007

_____
William Shelton

S:\wpdata\7482001\will shelton declaration.doc