<u>**CORRECTED COPY**</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMERICAN BEER DISTRIBUTING CO., INC.,

        Plaintiff,

  -against-           07 CV 8397

SHELTON BROTHERS, INC.,

        Defendants.

---

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER

  Defendant Shelton Brothers, sued herein as Shelton Brothers, Inc., submits this Memorandum of Law in Opposition to Plaintiff's Application for a Temporary Restraining Order.

### <u>ARGUMENT</u>

#### <u>Plaintiffs Do Not Meet the Standard for Injunctive Relief</u>

  It is well established in this Circuit that a movant seeking a preliminary injunction has the heavy burden of showing (1) irreparable harm, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly in the movant's favor. <u>Genesee Brewing Co. v. Stroh Brewing Co.</u>, 124 F.3d 137, 142 (2d Cir. 1997). Further, the award of injunctive relief is an extraordinary and drastic remedy that "should not be granted absent a clear showing that the moving party has met its burden of

proof." <u>Kraft General Foods, Inc. v. Allied Old English, Inc.</u>, 831 F.Supp. 123, 127 (S.D.N.Y. 1993).[1]

## I. **Plaintiff Has Not and Cannot Show Irreparable Harm**

The threat of irreparable injury is a *sine qua non* for the granting of preliminary injunctive relief. <u>Buffalo Forge Co. v. Ampco-Pittsburgh Corp.</u>, 638 F.2d 568, 569 (2d Cir. 1981). "If there is no irreparable injury, there can be no preliminary injunction." <u>Aiena v. Olsen</u>, 37 F.Supp.2d 303, 305 (S.D.N.Y. 1999). Importantly, the injury "must be one not capable of being fully remedied by money damages." <u>NAACP v. Town of East Haven</u>, 70 F.3d 219, 224 (2d Cir. 1995).

In the context of a distributor-manufacturer relationship, "[t]here is no legal presumption that a distributor suffers irreparable injury simply because it is terminated." <u>Lanvin, Inc. v. Colonia, Inc.</u>, 739 F.Supp. 182, 193 (S.D.N.Y. 1990). And, where a terminated distributor sells a number of other brands, it does not establish irreparable harm. <u>Id.</u>, *citing* <u>Newport Tire & Rubber Co. v. Tire & Battery Corp.</u>, 504 F.Supp. 143, 151 (E.D.N.Y. 1980).

---

[1]     Plaintiff argues that, because ABC § 55-c provides that injunctive relief may be appropriate – without setting out any strictures for such relief – this Circuit's preliminary injunction standard does not apply. This is wrong. Section 55-c does not set out a standard for the granting of injunctive relief. It merely gives the Court the power to grant an injunction. In that sense, it is no different than numerous federal statutes such as the antitrust law (15 U.S.C. § 26), which allows the court to grant equitable relief. But parties seeking such relief must still meet the requirements for an injunction. <u>See</u> <u>Freedom Holdings, Inc. v. Spitzer</u>, 447 F.Supp.2d 230 (antitrust statute's reference to injunctive relief does not replace preliminary injunction standard); <u>Blanksteen v. New York Mercantile Exchange</u>, 879 F.Supp. 363, 366 (S.D.N.Y. 1995) (rejecting argument that showing of irreparable harm was necessary where injunctive relief was available pursuant to antitrust statute). In contrast, the cases Plaintiff cites relate to statutes that provide specific standards for the granting of an injunction. That is not the case here.

Here, the sale of Shelton Products comprises just 21 percent of Plaintiff's gross revenues, meaning that nearly 80 percent of Plaintiff's business is derived from other sources. Loss of a small percentage of a Plaintiff's business does not constitute irreparable harm. Reiter's Beer Distributors, Inc. v. Christian Schmidt Brewing Co., 1986 WL 13950, at *11 (E.D.N.Y. Sep. 9, 1986) (no irreparable harm where sale of subject beers constituted between 17-29 percent of distributor's total sales); Lanvin, 739 F.Supp. at 193 (loss of 10 percent of gross sales not irreparable harm); Litho Prestige v. News America Pub., Inc., 652 F.Supp. 804, 807 (S.D.N.Y. 1989) (4% of business does not constitute irreparable harm); United Retail Inc. v. Main Street Mall Corp., 903 F.Supp. 12, 14 (S.D.N.Y. Oct. 31, 1995); see also National Football League Players Ass'n v. National Football League Properties, Inc., 1991 WL 79325, *4 (S.D.N.Y. May 7, 1991) (mere disruption of business does not constitute irreparable injury); Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co., 604 F.2d 755, 763 (2d Cir. 1979) (same).

When, as here, "the product whose distribution is to be terminated represents only a small, and non-critical, fraction of the plaintiff's business, then no 'irreparable harm' is threatened, and no injunction will issue." Galvin v. New York Racing Ass'n, 70 F.Supp. 2d 163, 170 (E.D.N.Y. 1998) citing Jack Kahn, 604 F.2d at 763. "In fact, in a business setting, only a real threat that a party will have to discontinue doing business is a sufficient injury for a finding of irreparable harm." Soffer v. Queens College of City University of New York, 1988 WL 36954, at *1 (E.D.N.Y. Apr. 14, 1988) (internal citations omitted).

Here, Plaintiff complains of a possible disruption to its business: "they cannot reduce their overhead because their infrastructure will need to remain intact to support

the rest of their portfolio." Pls.' Br. at 8.  From this disruption, which is the loss of – by

Plaintiff's own admission – no more than 21 percent of its revenue, Plaintiff predicts

catastrophic results including "the loss of all net profits of all the business, as well as a

loss of the wholesale direct distribution business."  Id.  Such dire predictions are not

supported by facts or logic.

Moreover, Plaintiff's claim of irreparable harm is inconsistent with its own

actions since it is actively selling off other brands that it currently distributes.  If Plaintiff

was concerned about maintaining an adequate volume to cover its overheard, it would not

be selling off brands as it is now.

The cases cited by Plaintiff for the proposition that a loss of distribution rights

constitutes irreparable injury all involve distributors facing the total destruction of their

businesses when distributorships involving 90-100 percent of their business are

terminated.  Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New

York, Inc., 749 F.2d 124, 126 (2d Cir. 1984) (finding that after 11 years of building a

business around distributing Coca-Cola, "the two owners of Roso-Lino . . . stand to lose

their business forever"); AIM Int'l Trading LLC v. Valcucine S.p.A., 2002 WL 1285557

(S.D.N.Y. 2002) (finding "the business will be destroyed if it is not allowed to continue

this relationship" because "plaintiffs themselves will have no products to sell").  Unlike

in the instant case, in AIM, the other product lines sold by the Plaintiffs amounted to

between 1 and 10 percent of total sales.  Id. at *2, n.3.

Similarly, in Two Wheel Corp. v. American Honda Corp., the court determined

that irreparable harm would result if a distributorship agreement was terminated between

Honda and a motorcycle dealer.  506 F.Supp. 806, 813 (E.D.N.Y. 1980).  Although

motorcycles and parts manufactured by Honda made up 50 percent of the dealer's sales, the other 50 percent of the dealer's business consisted of "aftermarket parts" or parts made exclusively for Honda motorcycles by other manufacturers. Id. The court therefore found that, after 15 years building a business as a Honda motorcycle dealer, the plaintiff's business would be destroyed by the termination of the distribution agreement. Id.

Interphoto Corp. v. Minolta Corp. involved a dealership that sold both cameras and camera parts, with the defendant's products making up 40 percent of gross sales of cameras and another 40% of part sales. 295 F.Supp. 711, 723, n.8 (S.D.N.Y. 1969). In addition, the plaintiff in Interphoto provided evidence that its customers would do business elsewhere if it could no longer supply Minolta cameras or parts. Id. No such evidence has been provided in this case, nor could it be since the Shelton Products comprise – at most – just 21 percent of Plaintiffs' revenues.

Finally, Galvin v. New York Racing Ass'n involved a veterinarian who had worked exclusively for 10 years at racetracks run by the defendant. 70 F.Supp.2d 163, 170 (E.D.N.Y. 1998). After his suspension from practicing at those tracks, the plaintiff's business declined from treating between 300 and 350 horses in a week to treating just 11. Id. at 172. Such a drastic change was considered by the court as amounting to the destruction of the plaintiff's business. Id.

Here, on the other hand, the Court is presented with a Plaintiff who has:

    (i)        substantial sales from other products that make up at least 79% of Plaintiffs' total revenue;

(ii)    the choice of literally thousands of other brands of specialty beer to sell;

(iii)   sold Shelton Products for only a little more than two years;

(iv)    sold off other bands of beer; and

(v)     had overseen a decline in sales of Shelton Products in the area it serves since ABD's allocation of product had to be curtailed due to non-payment.

Moreover, as much as Plaintiff talks about its "mom and pop" business, the fact of the matter is that the core of the Marino family business is a retail operation and this distribution business is merely a side line. Thus, unlike the plaintiffs in the cases cited by Plaintiff, the "mom and pop" operation here will continue to thrive even if it loses its distribution run.

Plaintiff's conclusory statements to the contrary are insufficient to establish irreparable harm. Jackson Dairy, Inc. v. H. P. Hood & Sons, 596 F.2d 70, 72-73 (2d Cir. 1979).

## II. Plaintiffs Cannot Demonstrate a Likelihood of Success

Plaintiffs invoke the provisions of NY ABC Law § 55-c, but the contractual requirements of § 55-c relating to brewers and distributors do not apply here since the statute applies only to "*sales and deliveries* in New York." N.Y. ABC Law § 55-c(1) (emphasis added); S.K.I. Beer Corp. v. Baltika Brewery, 443 F.Supp.2d 313, 319 (E.D.N.Y. 2006). As analyzed in detail in S.K.I. Beer, the contractual requirements of 55-c do not apply when beer is sold to a New York wholesaler but delivered to the wholesaler outside the borders of New York. Id.

Here, all of the beer is delivered to ABD in New Jersey and is shipped into New York by ABD. Further, the beer originally makes its way to New Jersey from Europe via cargo ship that unloads in a port in New Jersey. Once there, a warehouse operation run by a third-party contractor picks up the beer and stores it in a warehouse, where ABD takes delivery. This sequence of events has been consistent over the entire course of dealing between ABD and Shelton. As in S.K.I. Beer, the contractual provisions of § 55-c cannot be imposed on Shelton "simply because the wholesaler [is] licensed under New York law." Id. at 320. An interpretation of § 55-c to include extraterritorial deliveries "would run afoul of the dormant Commerce Clause . . . [since] the Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of a State's borders whether or not the commerce has effects within the State." Id. at 319-20. Since the term "'sale and delivery' [in § 55-c] cannot be extraterritorial, it must be that it refers to those acts occurring within the state's jurisdiction – New York State" and those acts do not include the delivery of beer outside of New York. Id.

Even if Section 55-c applies, it is clear that Shelton Brothers was entitled to terminate any relationship it had with ABD without giving prior notice and opportunity to cure. Section 55-c is clear and unequivocal in paragraph 5(a) that *"except as provided in paragraph (d) of this subdivision*, no brewer may cancel, fail, renew or terminate an agreement unless the brewer or beer wholesaler furnished prior notification in accordance with paragraph (c) of this subdivision (emphasis added)." Thus, paragraph (c), which requires prior notice, expressly exempts from the prior notice requirement termination pursuant to paragraph (d). Paragraph (d), in turn, expressly says "a brewer or beer wholesaler may cancel, fail to renew or otherwise terminate an agreement without

furnishing the prior notification to this section only ... (v) in the event of the failure by either party to pay sums of money to the other party when due ...."

ABD relies upon a lower court decision, South End Distribution Corp. v. Hornell Brewing Co., 179 Misc.2d 576, 685 N.Y.S.2d 594 (Sup. Ct. Kings Co. 1999), which held that a brewer could not terminate a distributor, even when the distributor had failed to make timely payment when due, because of the absence of a written agreement. The court reached this result by a truly strained interpretation of subdivision 5, paragraph (d), subparagraph(v), by holding that the clause relating to non-payment was modified by the words "pursuant to the reasonable terms of a written enforceable agreement between them" which appears later in paragraph (d). It is clear from the plain reading of the paragraph, however, that those modifying terms refer to the words immediately prior to the modifying terms, i.e., that "if either the wholesaler or brewer takes any action which would provide grounds for immediate termination pursuant to the reasonable terms of the enforceable agreement between them ...."

In any event, the result that the court reaches is clearly illogical in that it insulates a distributor from termination even if the distributor continues to refuse to make payment for goods delivered, simply because there is no written agreement between the parties. It fails to explain how the brewer is to receive payment for beer delivered. How long must the brewer remain in this untenable relationship? Presumably the brewer and the distributor would have to enter into a written agreement, but it obviously takes two parties to agree to a contract and the distributor could simply refuse to agree to the terms proposed by the brewer. The alternative would be for the court to act as a special master,

8

overseeing the negotiation process to ensure that a written agreement "reasonable" to the court were entered into. Obviously, that was not the intent of the drafters of the statute.

The statute is unequivocal that, whatever the nature of the agreement between the parties, in the event of failure of either party to pay sums of money to the other party when due and owing, either the brewer or the wholesaler "may cancel, fail to renew or otherwise terminate the agreement without furnishing the prior notification required under this section." § 55-c(5)(d)(v).

**III.    Plaintiff Has Not Raised Serious Questions Going to the Merits and the Balance of the Equities Tips Decidedly in Favor of Defendant**

This is essentially a breach of contract case in which the Plaintiff admits that it violated a material term of the contract. Failure to pay pursuant to the terms of a contract is generally considered a material breach. See ARP Films, Inc. v. Marvel Entertainment Group, Inc., 952 F.2d 643, 649 (2d Cir. 1991); Elliott Assocs. v. Republic of Peru, 12 F.Supp.2d 328, 344 (S.D.N.Y 1998).

First, it is undisputed that Plaintiff was consistently and grossly delinquent in paying its bill to Shelton Brothers. Second, Plaintiff's sole defense to the termination of the agreement due to non-payment is its assertion that ABC Law § 55-c prohibits termination of an oral contract on those grounds. Even if § 55-c applied (and it does not), there can be no serious question that a failure to pay amounts to a material breach of a contract. This is true whether the contract is oral or in writing.

Even if Plaintiff could demonstrate sufficiently serious questions going to the merits of the case as to make them a fair ground for litigation, it cannot meet the second part of this test and show that the balance of the equities tip in its favor. Under this prong of the test, Plaintiff "must make a greater showing of irreparable injury by demonstrating

that the balance of hardships is decidedly tipped in their favor." 13 James Wm. Moore et al., Moore's Federal Practice ¶ 65.22[5][b][iv] (*citing* Jack Kahn, 604 F.2d at 763).

As outlined above, Plaintiff has not met even the less stringent requirement by showing a likelihood of irreparable injury. Further, the balance of the equities decidedly tip in favor of Shelton Brothers. Shelton Brothers is on the verge of losing a substantial customer base because of the outrageously poor performance of ABD over the last two years. Shelton Brothers has received complaints from customers concerning the poor performance of ABD and Shelton Brothers' most substantial retail customer has advised Shelton Brothers that it will terminate permanently its sale of Shelton Brothers' line of beers if there is not a substantial improvement in the distribution system to that customer. Further, Shelton Brothers' potential loss of a profitable and remunerative relationship with Manhattan may be destroyed by the entry of an injunction. It is not at all certain that Shelton Brothers will be able to enter into a relationship with Manhattan at some uncertain date in the future.

Finally, Plaintiff should not be allowed to obtain an injunction in this Court enjoining Shelton from entering into a relationship with a distributor that is ready and willing to make the effort and investment that ABD has refused to make without promising to compensate, in the form of a bond, for the potential lost profits, if such an injunction is later found to have been improperly entered.

As more fully set forth in the accompany affidavit of William Shelton, the potential damages to Shelton Brothers could be substantial. The Shelton Brothers request a $50,000 bond upon the entry of a temporary restraining order and, if the Court should enter a preliminary injunction, the Court should require the posting of a $1 million bond.

## CONCLUSION

For the all the foregoing reasons, Plaintiff's Motion for a Temporary Restraining

Order should be denied.


Dated: October 4, 2007
      Albany, New York                 **BOIES, SCHILLER & FLEXNER LLP**


                 By:    _____
                           George F. Carpinello
                           Bar Roll No. GC4229
                           10 North Pearl Street, 4th Floor
                           Albany, New York  12207
                           (518) 434-0600

                           *Attorneys for Plaintiff Shelton Brothers,*
                           *sued herein as Shelton Brothers Inc.*


S:\wpdata\7482002\CLEAN CORRECTED TRO BRIEF.doc

**CORRECTED COPY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMERICAN BEER DISTRIBUTING CO., INC.,

     Plaintiff,

  -against-           07 CV 8397

SHELTON BROTHERS, INC.,

     Defendants.

---

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER.

   Defendant Shelton Brothers, sued herein as Shelton Brothers, Inc., submits this
Memorandum of Law in Opposition to Plaintiff's Application for a Temporary
Restraining Order.

### ARGUMENT

### Plaintiffs Do Not Meet the Standard for Injunctive Relief

   It is well established in this Circuit that a movant seeking a preliminary injunction
has the heavy burden of showing (1) irreparable harm, and (2) either (a) a likelihood of
success on the merits, or (b) sufficiently serious questions going to the merits to make
them a fair ground for litigation and a balance of the hardships tipping decidedly in the
movant's favor. Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 142 (2d Cir.
1997). Further, the award of injunctive relief is an extraordinary and drastic remedy that
"should not be granted absent a clear showing that the moving party has met its burden of

proof." <u>Kraft General Foods, Inc. v. Allied Old English, Inc.</u>, 831 F.Supp. 123, 127

(S.D.N.Y. 1993).[1]

### I.  Plaintiff Has Not and Cannot Show Irreparable Harm

The threat of irreparable injury is a *sine qua non* for the granting of preliminary

injunctive relief. <u>Buffalo Forge Co. v. Ampco-Pittsburgh Corp.</u>, 638 F.2d 568, 569 (2d

Cir. 1981).  "If there is no irreparable injury, there can be no preliminary injunction."

<u>Aiena v. Olsen</u>, 37 F.Supp.2d 303, 305 (S.D.N.Y. 1999).  Importantly, the injury "must

be one not capable of being fully remedied by money damages." <u>NAACP v. Town of</u>

<u>East Haven</u>, 70 F.3d 219, 224 (2d Cir. 1995).

In the context of a distributor-manufacturer relationship, "[t]here is no legal

presumption that a distributor suffers irreparable injury simply because it is terminated."

<u>Lanvin, Inc. v. Colonia, Inc.</u>, 739 F.Supp. 182, 193 (S.D.N.Y. 1990).  And, where a

terminated distributor sells a number of other brands, it does not establish irreparable

harm.  <u>Id.</u>, *citing* <u>Newport Tire & Rubber Co. v. Tire & Battery Corp.</u>, 504 F.Supp. 143,

151 (E.D.N.Y. 1980).

---

[1]      Plaintiff argues that, because ABC § 55-c provides that injunctive relief may be
appropriate – without  setting out any strictures for such relief – this Circuit's preliminary
injunction standard does not apply.  This is wrong.  Section 55-c does not set out a
standard for the granting of injunctive relief .  It merely gives the Court the power to
grant an injunction.  In that sense, it is no different than numerous federal statutes such
as the antitrust law (15 U.S.C. § 26), which allows the court to grant equitable relief.  But
parties seeking such relief must still meet the requirements for an injunction.  <u>See</u>
<u>Freedom Holdings, Inc. v. Spitzer</u>, 447 F.Supp.2d 230 (antitrust statute's reference to
injunctive relief does not replace preliminary injunction standard); <u>Blanksteen v. New</u>
<u>York Mercantile Exchange</u>, 879 F.Supp. 363, 366 (S.D.N.Y. 1995) (rejecting argument
that showing of irreparable harm was necessary where injunctive relief was available
pursuant to antitrust statute).  In contrast, the cases Plaintiff cites relate to statutes that
provide specific standards for the granting of~~with~~ an injunction.  That is not the case here.

Here, the sale of Shelton Products comprises just 21 percent of Plaintiff's gross revenues, meaning that nearly 80 percent of Plaintiff's business is derived from other sources. Loss of a small percentage of a Plaintiff's business does not constitute irreparable harm. Reiter's Beer Distributors, Inc. v. Christian Schmidt Brewing Co., 1986 WL 13950, at *11 (E.D.N.Y. Sep. 09, 1986) (no irreparable harm where sale of subject beers constituted between 17-29 percent of distributor's total sales); Lanvin, 739 F.Supp. at 193 (loss of 10 percent of gross sales not irreparable harm); Litho Prestige v. News America Pub., Inc., 652 F.Supp. 804, 807 (S.D.N.Y. 1989) (4% of business does not constitute irreparable harm); United Retail Inc. v. Main Street Mall Corp., 903 F.Supp. 12, 14 (S.D.N.Y. Oct. 31, 1995); *see also* National Football League Players Ass'n v. National Football League Properties, Inc., 1991 WL 79325, *4+ (S.D.N.Y. May 07, 1991) (mere disruption of business does not constitute irreparable injury); Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co., 604 F.2d 755, 763 (2d Cir. 1979) (same).

When, as here, "the product whose distribution is to be terminated represents only a small, and non-critical, fraction of the plaintiff's business, then no 'irreparable harm' is threatened, and no injunction will issue." Galvin v. New York Racing Ass'n, 70 F.Supp. 2d 163, 170 (E.D.N.Y. 1998) *citing* Jack Kahn, 604 F.2d at 763. "In fact, in a business setting, only a real threat that a party will have to discontinue doing business is a sufficient injury for a finding of irreparable harm." Soffer v. Queens College of City University of New York, 1988 WL 36954, at *1 (E.D.N.Y. Apr. 14, 1988) (internal citations omitted).

Here, Plaintiff complains of a possible disruption to its business: "they cannot reduce their overhead because their infrastructure will need to remain intact to support

the rest of their portfolio." Pls.' Br. at 8. From this disruption, which is the loss of – by

Plaintiff's own admission – no more than 21 percent of its revenue, Plaintiff predicts

catastrophic results including "the loss of all net profits of all the business, as well as a

loss of the wholesale direct distribution business." Id. Such dire predictions are not

supported by facts or logic.

Moreover, Plaintiff's claim of irreparable harm is inconsistent with its own

actions since it is actively selling off other brands that it currently distributes. If Plaintiff

was concerned about maintaining an adequate volume to cover its overheard, it would not

be selling off brands as it is now.

The cases cited by Plaintiff for the proposition that a loss of distribution rights

constitutes irreparable injury all involve distributors facing the total destruction of their

businesses when distributorships involving 90-100 percent of their business are

terminated. Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New

York, Inc., 749 F.2d 124, 126 (2d Cir. 1984) (finding that after 11 years of building a

business around distributing Coca-Cola, "the two owners of Roso-Lino . . . stand to lose

their business forever"); AIM Int'l Trading LLC v. Valcucine S.p.A., 2002 WL 1285557

(S.D.N.Y. 2002) (finding "the business will be destroyed if it is not allowed to continue

this relationship" because "plaintiffs themselves will have no products to sell"). Unlike

in the instant case, in AIM, the other product lines sold by the Plaintiffs amounted to

between 1 and 10 percent of total sales. Id. at *2, n.3.

Similarly, in Two Wheel Corp. v. American Honda Corp., the court determined

that irreparable harm would result if a distributorship agreement was terminated between

Honda and a motorcycle dealer. 506 F.Supp. 806, 813 (E.D.N.Y. 1980). Although

motorcycles and parts manufactured by Honda made up 50 percent of the dealer's sales,

the other 50 percent of the dealer's business consisted of "aftermarket parts" or parts

made exclusively for Honda motorcycles by other manufacturers.  Id.  The court

therefore found that, after 15 years building a business as a Honda motorcycle dealer, the

plaintiff's business would be destroyed by the termination of the distribution agreement.

Id.

Interphoto Corp. v. Minolta Corp. involved a dealership that sold both cameras

and camera parts, with the defendant's products making up 40 percent of gross sales of

cameras and another 40% of part sales.  295 F.Supp. 711, 723, n.8 (S.D.N.Y. 1969).  In

addition, the plaintiff in Interphoto provided evidence that its customers would do

business elsewhere if it could no longer supply Minolta cameras or parts.  Id.  No such

evidence has been provided in this case, nor could it be since the Shelton Products

comprise – at most – just 21 percent of Plaintiffs' revenues.

Finally, Galvin v. New York Racing Ass'n involved a veterinarian who had

worked exclusively for 10 years at racetracks run by the defendant.  70 F.Supp.2d 163,

170 (E.D.N.Y. 1998).  After his suspension from practicing at those tracks, the plaintiff's

business declined from treating between 300 and 350 horses in a week to treating just 11.

Id. at 172.  Such a drastic change was considered by the court as amounting to the

destruction of the plaintiff's business.  Id.

Here, on the other hand, the Court is presented with a Plaintiff who has:

(i)         substantial sales from other products that make up at least 79% of

            Plaintiffs' total revenue;

(ii)      the choice of literally thousands of other brands of specialty beer to

               sell;

(iii)     sold Shelton Products for only a little more than two years;

(iv)     sold off other bands of beer; and

(v)      had overseen a decline in sales of Shelton Products in the area its serves

               since ABD's allocation of product had to be curtailed due to non-

               payment.

Moreover, as much as Plaintiff talks about its "mom and pop" business, the fact of

the matter is that the core of the Marino family business is a retail operation and this

distribution business is merely a side line.  Thus, unlike the plaintiffs in the cases cited by

Plaintiff, the "mom and pop" operation here will continue to thrive even if it loses its

distribution run.

Plaintiff's conclusory statements to the contrary are insufficient to establish

irreparable harm.  Jackson Dairy, Inc. v. H. P. Hood & Sons, 596 F.2d 70, 72-73 (2d Cir.

1979).

## II.  Plaintiffs Cannot Demonstrate a Likelihood of Success

Plaintiffs invoke the provisions of NY ABC Law  § 55-c, but the contractual

requirements of  § 55-c relating to brewers and distributors do not apply here since the

statute applies only to *sales and deliveries* in New York." N.Y. ABC Law § 55-c(1)

(emphasis added); S.K.I. Beer Corp. v. Baltika Brewery, 443 F.Supp.2d 313, 319

(E.D.N.Y. 2006).  As analyzed in detail in S.K.I. Beer, the contractual requirements of

55-c do not apply when beer is sold to a New York wholesaler but delivered to the

wholesaler outside the borders of New York.  Id.

6

Here, all of the beer is delivered to ABD in New Jersey and is shipped into New York by ABD. Further, the beer originally makes its way to New Jersey from Europe via cargo ship that unloads in a port in New Jersey. Once there, a warehouse operation run by a third-party contractor picks up the beer and stores it in a warehouse, where ABD takes delivery. This sequence of events has been consistent over the entire course of dealing between ABD and Shelton. As in S.K.I. Beer, the contractual provisions of § 55-c cannot be imposed on Shelton "simply because the wholesaler [is] licensed under New York law." Id. at 320. An interpretation of § 55-c to include extraterritorial deliveries "would run afoul of the dormant Commerce Clause . . . [since] the Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of a State's borders whether or not the commerce has effects within the State." Id. at 319-20. Since the term "'sale and delivery' [in § 55-c] cannot be extraterritorial, it must be that it refers to those acts occurring within the state's jurisdiction – New York State" and those acts do not include the delivery of beer outside of New York. Id.

Even if Section 55-c applies, it is clear that Shelton Brothers was entitled to terminate any relationship it had with ABD without giving prior notice and opportunity to cure. Section 55-c is clear and unequivocal in paragraph 5(a) that "*except as provided in paragraph (d) of this subdivision,* no brewer may cancel, fail, renew or terminate an agreement unless the brewer or beer wholesaler furnished prior notification in accordance with paragraph (c) of this subdivision (emphasis added)." Thus, paragraph (c), which requires prior notice, expressly exempts from the prior notice requirement termination pursuant to paragraph (d). Paragraph (d), in turn, expressly says "a brewer or beer wholesaler may cancel, fail to renew or otherwise terminate an agreement without

furnishing the prior notification to this section only ... (v) in the event of the failure by
either party to pay sums of money to the other party when due ...,."

ABD relies upon a lower court decision, <u>South End Distribution Corp. v. Hornell</u>
<u>Brewing Co.</u>, 179 Misc.2d 576, 685 N.Y.S.2d 594 (Sup. Ct. Kings Co. 1999), which  held
that a brewer could not terminate a distributor, even when the distributor had failed to
make timely payment when due, because of the absence of a written agreement.  The
court reached this result by a truly strained interpretation of subdivision 5,  paragraph (d),
subparagraph(v), by holding that the clause relating to non-payment was modified by the
words "pursuant to the reasonable terms of a written enforceable agreement between
them" which appears later in paragraph (d).  It is clear from the plain reading of the
paragraph, however, that those modifying terms refer to the words immediately prior to
the modifying terms, <u>i.e.</u>, that "if either the wholesaler or~~OR~~ brewer takes any action
which would provide grounds for immediate termination pursuant to the reasonable terms
of the enforceable agreement between them.,...."

In any event, the result that the court reaches is clearly illogical in that it insulates
a distributor from termination even if the distributor continues to refuse to make payment
for goods delivered, simply because there is no written agreement between the parties.  It
fails to explain how the brewer is to receive payment for beer delivered.  How long must
the brewer remain in this untenable relationship?  Presumably the brewer and the
distributor would have to enter into a written agreement, but it obviously takes two
parties to agree to a contract and the distributor could simply refuse to agree to the terms
proposed by the brewer.  The alternative would be for the court to act as a special master,

overseeing the negotiation process to ensure that a written agreement "reasonable" to the court were entered into. Obviously, that was not the intent of the drafters of the statute.

The statute is unequivocal that, whatever the nature of the agreement between the parties, in the event of failure of either party to pay sums of money to the other party when due and owing, either the brewer or the wholesaler "may cancel, fail to renew or otherwise terminate the agreement without furnishing the prior notification required under this section." § 55-c(5)(d)(v).

## III.   Plaintiff Has Not Raised Serious Questions Going to the Merits and the Balance of the Equities Tips Decidedly in Favor of Defendant

This is essentially a breach of contract case in which the Plaintiff admits that it violated a material term of the contract. Failure to pay pursuant to the terms of a contract is generally considered a material breach. See ARP Films, Inc. v. Marvel Entertainment Group, Inc., 952 F.2d 643, 649 (2d Cir. 1991); Elliott Assocs. v. Republic of Peru, 12 F.Supp.2d 328, 344 (S.D.N.Y 1998).

First, it is undisputed that Plaintiff was consistently and grossly delinquent in paying its bill to Shelton Brothers. Second, Plaintiff's sole defense to the termination of the agreement due to non-payment is its assertion that ABC Law § 55-c prohibits termination of an oral contract on those grounds. Even if § 55-c applied (and it does not), there can be no serious question that a failure to pay amounts to a material breach of a contract. This is true whether the contract is oral or in writing.

Even if Plaintiff could demonstrate sufficiently serious questions going to the merits of the case as to make them a fair ground for litigation, it cannot meet the second part of this test and show that the balance of the equities tip in its favor. Under this prong of the test, Plaintiff "must make a greater showing of irreparable injury by demonstrating

that the balance of hardships is decidedly tipped in their favor." 13 James Wm. Moore et al., Moore's Federal Practice ¶ 65.22[5][b][iv] (*citing* Jack Kahn, 604 F.2d at 763).

As outlined above, Plaintiff has not met even the less stringent requirement of a by showing of a likelihood of irreparable injury. Further, the balance of the equities decidedly tip in favor of Shelton Brothers. Shelton Brothers is on the verge of losing a substantial  customer base because of the outrageously poor performance of ABD over the last two years. Shelton Brothers has received complaints from customers concerning the poor performance of ABD and Shelton Brothers' most substantial retail customer has advised Shelton Brothers that it will terminate permanently its sale of Shelton Brothers' line of beers if there is not a substantial improvement in the distribution system to that customer. Further, Shelton Brothers' potential loss of a profitable and remunerative relationship with Manhattan may be destroyed by the entry of an injunction. It is not at all certain that Shelton Brothers will be able to enter into a relationship with Manhattan at some uncertain date in the future.

Finally, Plaintiff should not be allowed to obtain an injunction in this Court enjoining Shelton from entering into a relationship with a distributor that is ready and willing to make the effort and investment that ABD has refused to make without promising to compensate, in the form of a bond, for the potential lost profits, if such an injunction is later found to have been improperly entered.

As more fully set forth in the accompany affidavit of William Shelton, the potential damages to Shelton Brothers could be substantial. The Shelton Brothers request a $50,000 bond upon the entry of a temporary restraining order and, if the Court should enter a preliminary injunction, the Court should require the posting of a $1 million bond.

## CONCLUSION

For the all the foregoing reasons, Plaintiff's Motion for a Temporary Restraining Order should be denied.

Dated: October 4, 2007
       Albany, New York                    **BOIES, SCHILLER & FLEXNER LLP**


By:        _____
           George F. Carpinello
           Bar Roll No. GC4229
           10 North Pearl Street, 4th Floor
           Albany, New York  12207
           (518) 434-0600

           *Attorneys for Plaintiff Shelton Brothers,*
           *sued herein as Shelton Brothers Inc.*

S:\wpdata\7482002\CORRECTED TRO BRIEF.doc

11